Judge Greenaway and I are privileged to have with us, sitting by designation from the federal circuit, Judge Kathleen O'Malley. It is a, Judge O'Malley, I don't know if this is your first time sitting with our court. First time here, yes. May it be the first of many. It is really, truly a pleasure to have you here with us. We have two cases this afternoon. The first is In Re Baby Products Antitrust Litigation, numbers 12-1165, 1166, and 1167. Mr. Frank, and then I guess Mr. Spector, and Mr., is it Wayman? Wayman, yes. May it please the court, Theodore Frank for the appellants. And I'd like to reserve eight minutes for rebuttal if it pleases the court. Sure. We have here a $35 million settlement where the attorneys are getting $14 million and change. And there's another $21.5 million where, to this date, there's nothing in the record indicating who and where it's going to. We don't know how much is going to the settlement administration, whether it's half a million or 2.5 million or more even. Sometimes on the settlement administration, although, you don't really know until it's over. That's correct, Your Honor. But in this case, the claims period ended August 1st and the judgment issued in December. There's going to be between $10 and $15 million going to Cypre recipients. We don't know how much and we don't know to whom, and that's still not in the record. And all we know about what's going to the class is that as of the date of the fairness hearing, there are 41,000 claims. And we don't know whether those are $5 claims or $180 claims or $15 claims or something in between. First of all, what was it exactly that you objected to in the district court and appealed to us? You were saying essentially that there's due process violations here as to what? There are a variety of problems with the final judgment approving the settlement, and we're appealing the settlement approval and we're appealing the $14 million attorney fee under Rule 23H. And on the settlement part, what is the violation of due process there that you're claiming? The Rule 23E notice does not indicate who the Cypre recipients are, giving the class no opportunity to object to that. There's no procedure below establishing that the class will ever be given notice of who the Cypre recipient is. I thought that on that one, the Cypre recipients will be noticed when they're determined and that you have an opportunity to object at that time. Is that not correct? There's nothing in the settlement providing for that. That's the representation of the parties on appeal after we've appealed. Had we not appealed and then attempted to appeal later, they would have said you should have appealed before. So we're in a situation where if we don't appeal now and get a ruling one way or the other, whether we should appeal now or appeal later, we would be prejudiced later. Let me take a step back. It would seem that if you have, what is this, a $34 million settlement? $35 million. $35. Okay. $35. And that it is estimated that at best, $8 million will go out to the three classifications or three categories of possible recipients. Is that correct? 18 or so. No, $8 million. They follow within three groups. That's correct. Wait a minute. I thought it was $8 million to the three groups. Well, we don't know that it's $8 million. It's probably closer to $1 or $2 million. Yeah, that's why I said $8 million at best. Right. But there's sort of a matrix. There's six certified subclasses based on individual products. Some are $300 products. Some are much cheaper. And then there are three categories. But wasn't Judge Brody that said that she thought it would be $8 million at best? That's correct. Okay. So let's just give it the at best for the moment. And then you have going out to counsel $11 million plus fees, or I'm sorry, plus expenses, which equal another $2 to $3 million. So roughly $14 million to counsel. And under that best scenario, you would have $12 million going out to yet unidentified SIPRI recipients. Is that correct? That's correct, Your Honor. And I thought your argument would be that doesn't fit as to what normally is done in a class action. But it doesn't seem that's really the argument you're making. Well, that is one of the arguments we're making. Where is it in the brief? It's in the section where we're complaining about the proportionality of the attorney fee relative to the class recovery. Well, that sounds like what you're saying there is you should take the $35 million less the whatever goes to the SIPRI recipients, which has yet to be identified, and not really calculate attorney's fees until you subtract the SIPRI amount from the actual amount going to the class. Well, Your Honor, understand and under prudential, this circuit follows a percentage of the recovery standard. But it would be recovery to a class as opposed to a payout to – I'm just saying what I would expect it to see, but I didn't see it there. I really thought I put it there. And we cited Heartland, and we cited Prudential, and we cited a variety of cases relating to the issue of the proportionality of the attorney fee relating to the class recovery. And all we're asking for is that the court, that the district court instead of doing a percentage of the fund basis to what the actual circuit standard is, which is a percentage of recovery basis. That's on attorney's fees. I'm talking about the settlement itself. Well, that's reflected in the fact that the notice, the 23E notice about how to make a claim and the four-page claim form, which deterred class members from making legitimate claims by telling them, by failing to tell them the ways that they could make legitimate claims for substantial amounts of money and instead tell them, if you fill out this four-page form, all you're going to get is $5. That reduced the number of claims, and that's one reason why we only have 41,000 claims and one reason why. Part of the reason for that, at least I can understand the principle, is you don't want to give a whole lot there because a lot of people might just file a claim form and never have purchased anything. Well, and that's why you require these things to be done independently of perjury. That's why you can have audit procedures, and certainly that's a reason to prioritize the people who have the better proofs of purchase, the receipts and the credit card statements, over the people who only have photographs or declarations. You suggest that we should, say, adopt the ALI principles for purposes of use of PSI PREA awards, but I don't see anything in the ALI principles that says that the PSI PREA has to be identified up front before the settlement can be approved. But you seem to say that the initial notice has to contain the identity of the PSI PREA recipients. Where do you read that in the ALI principles? I don't read that from the ALI. I read that from the fact that it is a material term of the settlement that can scuttle a settlement, as happened in Dennis v. Kellogg out of the Ninth Circuit on September 4th, and has happened in several other cases, such as Notchin v. AOL. That's beyond what you're asking as it relates to the ALI principles. You want us to also adopt an additional requirement. Is that right? I want the court to do the same thing that the Dennis v. Kellogg court did, which was say that you can't have a trust us approach to PSI PREA. Now, as it relates to the size of the PSI PREA, are you arguing that class members should be overcompensated instead of having large sums going to PSI PREA, or simply that there should be a mechanism to make sure that they're sufficiently compensated? I'm not quite sure which argument you're making. The court can go either way on that. The ALI says that you don't have to have a windfall go to class members, so we're not saying that you have to have a windfall go to class members. But the class members with $175 claims who are only getting $5 under the I think that set of class members is unfairly prejudiced. Is your objection to the notice in any way tied to this PSI PREA issue? It's hard to tell whether your objection to the notice is independent or whether you're saying that somehow the notice would have resulted in more class members in the other subclasses. Those are three separate issues. One is the notice of how a class member can make a claim. One is the notice to the class of who the PSI PREA recipient is. And one is the prioritization problem where the court failed to follow CLEAR and other precedent in putting the class members ahead of the PSI PREA. Right. And what ways do you propose that the class members get put ahead of the PSI PREA? The PSI PREA is not distributed until all class members have been fully compensated, as CLEAR says, 658 F3, 468. Okay. And I'm still trying to find it. Which class members do you think have not been fully compensated? Are you limiting yourself to the $5 recipient? Yes, Your Honor. We're not challenging the holding that the class members who got 60% of their purchase price are fairly compensated. Well, let me pick up on something that you mentioned a few moments ago, the trust us notion. Isn't it really not trust us since there's court oversight? Well, there is court oversight in Dennis v. Kellogg, too. Yeah, but this is not – when we pick that PSI PREA recipient or recipients, we will let you know and you can come in and object. That seems to be different from Dennis by a significant margin. Well, there's no procedure in the settlement saying you can come in and object. They now agree to that. They now agree to that. But if you affirm without saying you can come in and object, we don't get to come in and object. Gotcha. And as – I'm sorry. Go ahead. I want to just finish this one point. So you don't disagree or – no double negative. You agree with that procedure. I don't agree with that procedure because I think it's better for the court to do it in one fell swoop rather than piecemeal, and that's what Dennis v. Kellogg held. But it's unacceptable. We're not going to appeal that to the Supreme Court if that's what this – if this court decides that the Third Circuit's happy with multiple appeals. But we need to have that precedent. I think we all like to not make decisions when we don't have to, and if there's some agreement, then, you know, it takes it off the table. Well, like I said, I don't agree. I think the Dennis v. Kellogg rule is better, that you don't – you shouldn't have piecemeal appeals. You shouldn't force defendants to have two sets of notice going out to class members. Just do it all at once. But even – okay. In that case, what would you have appealed on then? If you – if the CyPra recipient was – recipients were listed at that time, at the time of the settlement, and let's say you were satisfied with them, would you still have objected? Yes, because the fees are disproportionate to the class recovery and the notice to the class that they could recover. The settlement is structured to benefit the attorneys and the attorneys' favorite charities rather than the class members. How much additional do you think would go out to class members if there were modifications made to the settlement agreement that you would like to have in place? Well, it could be any – there's 1.3 million class members. You know, even if just 10% of them made claims, that would triple the number of claims made. And instead of one or two or, unrealistically, eight million being distributed to class, we could see the entire 18, 19 million go to the class. And, again, we don't know how much is actually left over after settlement administration and notice. That's just by correcting the notice issue. That's correct. Okay. I see I've run out of my initial time. I've asked for rebuttal time and all that. That's fine. We'll get you back to it. Thank you, Ron. Thank you. Mr. Spector? Mr. Jambro, may it please the court, Eugene Spector on behalf of the appellee's class plaintiffs. Maybe at the outset. I mean, there's something about this type of settlement that doesn't seem – it's out of the norm where you have a – or seems to be out of the norm where you have, at best, going to class recipients, eight million, probably significantly less than that under the current way it's set up. You have 14 million going to counsel and 13 million going to CyPray recipients. Normally, you don't see the class members getting less than counsel. Normally, you don't see class members getting less, and I mean significantly less in both cases, than the CyPray recipients. And, I mean, I've talked with other judges on this, and nobody seems to remember anything like that. I'm not aware of a similar situation either, Your Honor, but I think I'd like to take this back and put the whole thing into a context. We entered into a settlement agreement. The purpose of the settlement agreement was obviously to compensate the class members. We divided the class up based upon the products that were involved. We allocated damages based upon the analysis done by our expert in terms of what those damages would be. We presented that to the court for preliminary approval and sending notice to the class. And in that notice and in the claim form, we explained to the class these various categories and what would be involved. And, in fact, the claim form itself spells out the language that is at issue here, and the claim form says that to recover the maximum amount you can from the settlement fund for your purchases, attach documentation showing your purchases of the products listed above. Well, did you anticipate that a lot more claims were going to be made? Absolutely. So you didn't anticipate such a huge CyPray? Of course not. And why is it then that you didn't build in a mechanism into the settlement agreement to guard against that huge CyPray, such as a second notice to the class attempting to get more claimants or a potential for renegotiation of the $5 cap? I mean, wouldn't it have been better to guard against this result? Well, Your Honor, I will be honest with you. I guess with hindsight, a lot of things would have been better. But if you look at it at the time, and let's do that. At the time, we knew that we had $35.5 million in a settlement fund. We knew that we had, and that represented approximately 24% of the damages that the class members could claim. We knew that we had 1.3 million notices to send out. We had that information. We assumed for purposes of determining, and you can assume anything that you like, but for purposes of determining whether CyPray actually would come into effect, we thought about 10% claimants and 5% claimants. And when you apply that and assume that half of them would be $5 and half of them would be full value claims, for want of a better expression, all of the money is used up. We don't get to CyPray. Right, but maybe this is my economics background, but that's one assumption. Of course. Shouldn't you have also made the alternative assumptions that would have guarded against exactly what occurred here? I mean, putting aside whether the court adopts the ALI principles, and there are plenty of courts that have said that CyPray is supposed to be the exception. It's not supposed to be the tail wagging the dog, which is what it ends up being here, especially when you have the attorney's fees award applied against the entirety of that figure. So shouldn't you have made the alternative assumption that perhaps there would be money left over that would be too large for a reasonable CyPray award? Well, there's always that possibility. That possibility certainly does always exist. The question then becomes whether what you can do to resolve that problem is more costly and will result in more benefit than the alternative. But a re-notice and a redistribution to the class is not going to cost $10 or $11 million, right? No, it won't. It will probably cost $1.5 or $2 million. And it would probably – it might result in more claimants, but it might also result in the same number of claimants. Well, if it resulted in the same number of claimants, then wouldn't you just change your assumptions with regard to how you came to the $5? Wouldn't you just say, well, we now know – let's say you get – you re-notice, you get the same number of people. Now we know the entirety of the class. You know, we think that the percentage of distribution to CyPray, to counsel, and to the classes is skewed. We want to change the percentage. You could do that. Or you could have done that, I should say. Again, with proper notice to the class, with proper opportunity for people to come in and object, you can do almost anything, Judge Greenway. There's no question about that. The question here is, though, I'm a district court judge. My job is to review the settlement and determine whether it's fair, reasonable, and adequate at the time I review it. So the first time I review it is, of course, at the time of preliminary approval when notice has to go out that describes the settlement to the class. Then the next time I have to review that is before the close of the claims period, but at some time later. So there's a bit more information, not necessarily enough information to tell you that there's going to be a small number of claims. The assumption that Judge Brody made here that there would be, at best, an $8 million set of claims might very well have been right. It also might have been wrong. As it turns out, it probably was an overestimation. I think it probably was. I mean, the problem you have here from a court point of view is an optics issue. If you have, for example, a precedential opinion that comes down that says, okay, we're going to adopt the ALI principles, and under those ALI principles, we're going to approve or allow a settlement to go forward in which you have much, much less going to the class than you do to counsel and much, much less going to the class than you do the yet unidentified CyPRAE recipients, it sends a message that, okay, I can file a suit here, settle, and, among other things, get attorney's fees based on the full amount of the settlement, when, in fact, I really didn't benefit the class that much. And don't get me wrong, I realize here that you're taking a big hit on the dollar, so I'm not, but it's what we've, the facts that you have in this case before us are not a great set of facts in which to go out and set precedent. I guess part of the problem comes back to how many times does a district court judge have to review and how often should a district court judge have to review a settlement agreement and settlement terms to determine whether it's fair, reasonable, and adequate, and then come back and revisit that issue. If we set a standard, and in this particular case, I think it's very difficult for anyone to argue that Judge Brody did not follow the law. If you look at her opinion, if you read her opinion, she followed everything that this court has directed that she does. But in this case, if the purpose of a class action is primarily to compensate those in a class, and when those in a class who are under Category 1 or 2, I guess, are getting treble, the claim that they have, and yet the aggregate amount is so little compared to the amount of the settlement, it's no looker too good. I understand that, Your Honor, but how, part of the problem is how do we make people file claims? We send out, we send out notice. I can tell you what your friend's response from the other table will be, and that is that you send out a notice that gives them some hope that they might be able to actually file one successfully. I mean, their argument was that your notice was so strict with respect to what the requirements were. I mean, I don't keep proof of purchase on major purchases, much less baby furniture. And, Your Honor, nor do I. And one of the reasons that we provided for people to be able to make claims without proof of purchase was for that very reason. Well, there's a debate as to whether or not you're, well, you're talking about the $5 claimants? Yes. Okay. And, you know, Judge Brody made a decision. The question about whether the $5 was a fair payment to a group of people who had no objective proof that they purchased the product, that they purchased it at Babies R Us, and that they purchased it during the class period, she viewed as not an unreasonable burden and not an unreasonable thing to do because otherwise you're going to encourage fraud. And that was a balance that she tried to make. Encouraging fraud, you know, I agree that fraud's not a good thing and that you need to try to guard against it, but just hypothetically, are you going to submit a false statement under oath to a federal court for $7.50? You're going to submit a false statement under oath to a federal court for $10? Well, Your Honor, first of all, it's $5 a product and it's eight products, so it could be $40. That's first. Secondly, people do it. Even there, it's not worth the jail time. Well, I don't think any of it's worth the jail time, Judge Ambrose, and I personally wouldn't do it. But I think that we're fairly aware that it gets done. That false claims are submitted in these cases. Look, as we said in the record below, we consulted with our administration expert about what numbers should be used, how do we balance between encouraging claims and discouraging fraud, how do we deal with these issues, and that was a number that they suggested and thought would be fair. But then that brings you full circle back to the issue with respect to the notice to the other classes, which is did you really need to require the proof of purchase? I mean, that whole discussion that you had with the trial court during the settlement hearing where you said, well, maybe somebody could send in a photograph, but there was nothing in the notice that would allow that. Oh, I disagree, Your Honor. I think that you're reading the notice far more narrowly than I think a class member would read it. It says that you need some form of documentation. It gave examples of the kind of form of documentation that would be acceptable, but it didn't say that's the only kind, and, in fact, it said quite openly that anything would be fine. The fact of the matter is that documentation means anything that would prove it, and a photo in and of itself won't prove that you're a class member. It'll prove that you have a picture of the product. You're going to need some more evidence, and I think, as I said in the record, you're going to have to show with whatever it is you produced that you bought it at Baby's R Us, at the very least, and that doesn't happen with just a photo. So, really, the problem that we have here, it's clear, is the number distribution. Yes. But your point is, listen, sure, things could have been done differently, but there's nothing that Judge Brody did that was improper. If we want to come up with a new test, we can come up with a new test or specific directions if something unusual like this happens. I think part of the problem is none of us have ever seen a distribution like this before. You know, if this case were, let's say, $20 million to the class and $14 for counsel fees, you know, you might say, okay, fine, you know, because that's the usual case. Side prey is usually an afterthought. It's the residue after you've fully compensated the class. And that was the intent here. That's what we tried to do. We set up a procedure. I know Mr. Frank says there's no procedure, but the settlement agreement provides that the plaintiffs and the defendants would recommend potential side prey recipients to the court. The court would evaluate that and make a decision. So there is a procedure involved. And any time the court's going to enter an order, that order is appealable. I'm not sure what it is that Mr. Frank is complaining about in terms of appealability. Well, let me ask you this. I'm not going to focus on appealability. I'm just going to focus on sort of a practical view of this. Is it a practical resolution that district courts in the future, when any time the side prey distribution exceeds the class distribution, that that's a red flag of sorts? I mean, here it is a little extraordinary, but is that something that's workable? I guess part of the problem is when do you know? I mean, Mr. Frank talks about the Dennis case in California, Dennis versus Kellogg. In that case, if you looked at the settlement agreement, the first thing it provides is for a $5.5 million side prey fund, and then for a million or $2 million cash fund for the class. And obviously when you have that kind of a setup, you know that there's going to be a side prey award. You can talk about who the recipients are and when. At the time of Judge Brody's settlement, she made the assumption that the side prey award would be larger than the award to the class. I mean, it's not that different here. This is not a situation in which everybody thought it was going to be a small residue left over. Everybody knew at the time of the approval that it was going to be larger than the payment to the class. At the final approval, not at the time of the settlement agreement. Not at the time that the settlement agreement was negotiated and signed. Not at the time that the notice was sent to the class. The final approval is when the judge has to make that decision. You know, that initial approval is supposed to be a very cursory look. There's no – I mean, the law is very clear on that. But that doesn't mean that you're stuck with it. That's why you have another hearing. Of course. And if Judge Brody thought that there were a problem, she would have obviously not approved the settlement because that would have been what her option was. It wouldn't have been to rewrite the settlement. It wouldn't have been to do anything other than at that point disapprove it. What about the possibility of going back and doing a recalculation, as you had alluded to earlier, when you have a more final, the amounts that are paid out and that you anticipate coming in? That obviously can be done. It's done in the cases under CAF, I believe, where you have a coupon settlement. But we don't have a coupon settlement here. We have an all-cash settlement. So we know what the fund is. The only question is, how was it ultimately going to be distributed? I think that no one at any point thought prior to seeing the claims as they came in by the settlement hearing, anybody thought at any time that the PSY Prey fund would be larger than the claims fund. Although it seemed as if at the time that Judge Brody made the high estimate of $8 million, that looks like ipso facto. You've got a huge amount of a PSY Prey distribution to come, and you haven't even notified anybody who that will be because perhaps at the time you didn't even know who it will be. Well, I don't think at the time, Your Honor, we didn't think it made sense to try to identify potential PSY Prey recipients and get the court to approve that as part of the settlement because we didn't know whether there were going to be any, and we didn't know what the amount would be. So that would have some impact. But wouldn't Judge Brody estimate that at best there would be $8 million distributed? That was at the final settlement approval hearing, Your Honor, not at the time we entered into the settlement agreement. That was after part of the claims process had played itself out. So at the final settlement approval, I mean, you've got sort of a couple of uh-oh moments then because, as you said, you haven't seen this. I've talked with others. They haven't seen it. That's correct. We're in a different area than anything any of us have dealt with before or seen. To a certain extent, Your Honor, I would say that while it's not quite that magnitude, the Lupron case deals with that kind of idea where, unfortunately, the number of claims that were made were less than anybody anticipated, and there was an $11 million settlement, PSY Prey fund to be awarded. So in Lupron, it was certainly not to the same degree that it is here, but that idea did present itself to the court, and the court, I think, dealt with it appropriately. But I guess in Lupron, the court made a determination that the scope of the claimants had been essentially exhausted. They knew this is the full extent of the claimants. Correct. And obviously, your adversary says that not so here. Well, the question here, I guess, on that issue, Judge Greenaway, is whether paying $5 to those who submitted a claim form without any substantiation that they actually purchased the product satisfies their claim. Right. If it does. Yeah, that's one of the key questions. If it does, then I don't think there's an issue with regard to the PSY Prey recipients. And I think that Mr. Frank kind of conceded that if there weren't PSY Prey here, setting up a class or a subclass based on those without proof of purchase at some set number, a small number, in order to balance for fraud would be acceptable. It's the problem here from his standpoint is that there's a PSY Prey recipient who's going to get money that these class members might otherwise get. I think that's what his problem is. Not the fact that there's a $5 cap for people who have no proof. Well, I think if he were at the microphone, he'd say it's both, but that's neither here nor there. I'm sure he will when he gets back up. We can be certain of that, right? I can almost guarantee you, Judge Greenaway. Why don't we hear from Mr. Wayman, please? Thank you, Your Honor. Good afternoon. May it please the Court? Mark Wayman from Reed Smith. I represent the Toys R Us and Babies R Us defendants, but I'm speaking today on behalf of all the defendants with the exception of McLaren. McLaren is in bankruptcy and there's been relief from the Automatic State of Appeal to proceed, but they haven't appeared today. Your Honor suggests that this case is a little bit out of the norm, and I think we all agree with that. The issue, however, is that none of us knew or anticipated that it was going to be out of the norm at the time that we signed the settlement agreement. And I think at least providing a defense perspective, I can tell you that we yielded relatively easily on the provision of the agreement concerning excess funds going to side prey because we didn't have any great anticipation that there was going to be any meaningful amount that necessarily The problem I have with this argument is that you're making the same point, I guess, that counsel for the claimants did, and that is that somehow it's more important what happens at the time of the initial approval than there is at the time of the final approval. Because as of the final approval, everybody knew that there was going to be a huge side prey award. And there's still an opportunity at that point for an effort to say, you know what, you need to come up with a mechanism. And the court could have simply ordered you all to say, sit down and either renegotiate that $5 cap or possibly consider re-noticing to the class to make it clear that the standards were not quite as strict as it might have appeared in the notice or to find more class members. Courts do that all the time. I understand, Your Honor, and I think there's a couple of things in your question-slash-statement. First, at the time of the final hearing, the claim spirit hadn't ended yet. But it was far along, and I think it could have been reasonably anticipated that we weren't going to get the kind of yield that we had all anticipated. The notice point, I think, is really a separate issue. And the suggestion by Mr. Frank is that the notice was faulty because it didn't specifically say that a photograph would have been acceptable. And I think that that's really an argument without any merit. If you look even to the Federal Rules of Civil Procedure, when they talk about what's within a document request in Rule 34, it provides a litany of different types of things. Included among those things are photographs and other graphic images. So the suggestion that other records wouldn't include a photograph, I think, is just a faulty one. So, indeed, I think that the fact that many claims, I think, came in for the $5 suggests that people weren't prevented in any way or discouraged from putting in claims. What was the aggregate amount of claims for the $5 Category 3? I'm not certain. I think it's in the range of somewhere north of 30,000 is my understanding. So that only equals roughly $150,000 to $160,000 total? Correct, Your Honor. So I don't think those folks were discouraged. And I think that the reality in terms of assessing that $5 point when we negotiated was, you know, there was some sentiment towards not providing anything in the settlement for those who couldn't document their claim, which is not an unreasonable position. I think one that likely would have been approved by the Court, in which case we wouldn't be here. Another point of view is, and this is a defense point of view, is perhaps if we had set up an agreement that said we'll pay, you know, treble damages for anybody who can document the claim, and we'll give $5 for anybody who will swear that they actually purchased the product, and we'll pay whatever attorneys fees the Court awards, right? I don't think we'd be here today, right? Because it's just this cypre issue, which suggests to me that, you know, perhaps plaintiff's counsel, and it pains me a bit to say so, did a really good job in getting us to pay as much as we did. Because, candidly, none of us expected the circumstance that presently exists to be the case. We just would never have anticipated that. Well, from your perspective, it's not a situation in which the question is whether you have to pay more money. It's really a question of the allocation of what's been paid, correct? That's correct, Your Honor, but it's also a question of what we would agree to and what we did agree to and why. We don't want to encourage fraudulent claims. I mean, the people who are getting money are my clients' customers, right? These are the folks, in order to be eligible for a claim, you had to purchase one of these particular products at a Toys R Us or Babies R Us store or online. So we feel good about the fact that as part of the settlement, money is going to our customers and it's not going to strangers. So that's a positive. It's not going to retailers. Pardon? It's not going to retailers. Correct. Yeah, I mean, the bottom line is your economic assumptions were off because you obviously thought you'd have a larger number of claimants. The Cypre would be, if not nonexistent, certainly nothing that we'd talk about. You know, that the classes would probably be, you know, north of 15, 16 million, and this wouldn't be an issue. That's exactly correct, Your Honor. We went through an elaborate, I mean, Your Honors have had the misfortune to read through the allocation order. We spent a tremendous amount of time on that, which involved essentially a determination that if there wasn't enough money in one of the settlement classes, how money might be allocated from another settlement class to make sure that everybody ended up with something close to the same percentage recovered. But that, I think, is getting to what Judge O'Malley has been asking about. That is, if certain assumptions are made, you get to that point in time when everybody now sees where the numbers are. Shouldn't that have been the moment of reflection when folks said, well, wait a minute, if the Cypre is an inordinately large number, shouldn't we be taking a step back? I understand the question. I think the answer is no, and I'll tell you why. Because I think an assessment was made in connection with the negotiations that a fair resolution for the class would involve a maximum of treble damages to those who could document their claim and a maximum of a $5 distribution for each settlement class that somebody who couldn't document their claim would get. And end of the day, the fact that there are these additional funds doesn't mean that anybody else, any of those who put in claims should get a windfall. So then the question is, and you see this in a lot of the case law, how do you benefit the absent class members? Because we know that there are a lot of people out there that were, you know, I don't think 1.3 million is the right number for class members. I think it's actually substantially in excess of that. We were able to identify that number of people with addresses that we could write to. But there were many more people from prior years that we didn't have that information for. So we know that there's, you know, probably a couple million people out there. And how do we benefit them too? Because they were members of the class, and that's what the side prey remedy is designed to achieve. And the question is, as a matter of preference, right, do you put the money in a side prey, give the money to a side prey recipient or a series of recipients that could benefit all those people, or do you give those who were just going to get $5 per settlement class more money for some other reason, just because there's extra money available? And I don't think that there's any error of law that Judge Brody made, even understanding as of the time of the settlement, final settlement hearing, that it was very likely that we were going to have this disproportion, if you will. I don't think it's a wrong decision under the law to say this is a fair, reasonable, and adequate settlement by providing that those with documented claims get X, those without get Y, and the remainder is going to go to charity for absent class members is not an inappropriate resolution. Well, why don't you help us with line drawing for a minute, right? If you think that this proportion is acceptable, would a proportion where the class members got $4 million, for instance, and the side prey distribution was $16 million, would that be reasonable? There's got to be some point at which the proportion among the three piles of funds has got to be off, and I think that's what we're getting at. At some point, the side prey seems to be skewed, and there has to be a recalculation. I'm not sure that that's so, Your Honor, and I'll tell you why. I think there are settlements, and they've been approved at the appellate level, that really essentially provide that there's a remedy and there's funds, and the funds don't go to the class per se. The funds go entirely to side prey recipients, and that's considered okay under certain circumstances where you can't identify the class members or it's too expensive to send the funds to them. So I think there is the possibility that you could have a settlement where the financial compensation is purely side prey, which tells me that the proportionality that Your Honor describes isn't necessarily a requirement. I haven't seen any cases that set forth the requirement that the amount that actually gets distributed as opposed to the amount that goes to side prey must be in a certain ratio. I get, and I think we all do here, that this is out of the norm because none of us, all of whom are experienced, haven't seen a case quite as extreme as this in that respect. But my view was, and this was a matter that we negotiated at the time, I mean, not that it matters in any meaningful way, but the issue as to whether to give these folks $5 was something that we negotiated hard and long about, and candidly, I think on the defense side, most of us were against it entirely. We felt, by all means, give those who can document their claims everything that they're entitled to, but those who can't document their claims shouldn't get anything. But I think giving them something shouldn't then open the door to say that, you know, it's an unfair settlement because a lot of money is going to charity. Let me ask you this. As of today, what is the anticipated amount that you think is a range for payout to the class members? My understanding, Your Honor, and I just saw some figures this morning, I haven't had a chance to study them, but I believe it's slightly under $3 million is my understanding. So slightly under $3 million. No, I don't think that's not, just so Your Honor understands, I don't think that's a final number because this is a procedure that our settlement provides for in which the class administrator or the claims administrator is to report that back, works with the plaintiff's counsel, it then goes to the district judge, and Judge Brody would ultimately have to approve it. So let's just say, let's pick a number, let's go with Judge Romero's number. Let's say it's $4 million, and the counsel fees and expenses come to $14, and that leaves $17 million for CyPrey. And maybe the $35 million is the right number to settle. Let's assume it is. The question then becomes, and I think it's the point that Judge Romero has been probing for, what could have been done at the time of the final approval of the settlement that could have made the numbers less glaring in terms of their contrast, such as giving more to the, instead of $5, giving $10 or $15 or $20? It's not going to be that much difference in terms of the fraud that may come out, probably none. What about a re-noticing to the class? What about making the procedures otherwise easier to prove under Category 1 or 2? Any other thing you can think of? Why wasn't that done or proposed? I can't answer why something wasn't done other than it wasn't on our plate. It really wasn't suggested to us. I think that the objections that we received weren't quite as pointed as the place that we are now. I don't think there was a suggestion that we needed to notice again. And remember, we're at that point where we still have, I think, about three weeks to go in the notice period, and lots of people are procrastinators, and we didn't know how many were going to come in between those two points in time. But obviously we weren't going to get to a level that was going to be very, very high. I mean, we anticipated that. But we didn't talk about it. It wasn't suggested. And we didn't really consider doing something along those lines. You know, hindsight is— If we were to send it back, you would get that opportunity. I think that's right, Your Honor. But the question is, you know, should that be the case? Should it be that in a class action settlement context, right, where— I mean, nobody claims that the notice program was not properly set up or was ineffective. Well, Mr. Frank is saying that he does object to not letting him know at the time of the approval who the CyPRI recipient or recipients would be. That I understand. I think he has two complaints. One is that and one is with regard to the photograph issue. But I don't think there's anything in the record that suggests that either of those omissions, if you will, had any bearing on the number of claims that were filed. I can't imagine that somebody wouldn't file a claim because they didn't know where CyPRI funds might go if CyPRI funds were going to be in the picture at all. I don't think that that's a reasonable, rational decision. In terms of the photograph issue, sure, I think that it's possible that, you know, if the resolution were that you could just take a picture of your product and get more than the $5, maybe other folks would have done it. But that wasn't what was said at the hearing. That's not what any of our understandings are. I mean, is it possible that a photograph, you know, could have shown that you purchased from Babies R Us and when you purchased? It's possible, right? Some people take pictures of all kinds of events. I mean, if they took a picture coming out of the store with the shopping cart and there was a date on it, you know, I think the claims administrator probably would have said, you know what, close enough. I mean, it would be nice to have a receipt, but that's close enough. But the average just, you know, being in the park and taking a picture of a stroller, that doesn't get you any more than your signed affidavit. So I don't think – What if there was a serial number on it or what if you had a barcode on it? I mean, there's all kinds of things that could be identifying information. That's true. But that, you know, there's no reason that wouldn't be another record that showed, you know, under the terms that are set forth both in the notice and in the claim form, which says that other records would be acceptable that show, you know, that you purchased it from Babies R Us or Toys R Us and when you purchased it. Well, I think you're missing Judge Ambrose's point here, and that is that even if you objectively thought that that notice was okay the first time around, by the time you got to the final settlement hearing, you realized that not many people responded. And so the question is maybe at that point you should have said, we need to send out a notice that is a little more broad, a little more inclusive, encourages people to make claims. And that's the whole point of these class action settlements is to encourage the class to participate. I understand that, Your Honor. I think we've got, you know, somewhere between 40,000 and 50,000 claims, so obviously a lot of people understood the claim form, were able to fill it out and send it in properly. You know, the plaintiffs engaged the claims administrator, who was expert in class notification programs, put in an affidavit in connection with the approval process and explained why we were to take all the steps that we did, which included a mailing, included publication, included all kinds of, you know, what I'll call cutting edge Internet advertisements that I had never been part of before that were designed to essentially reach north of 80% of the class and was designed to get the greatest result possible. So while I think that Mr. Frank objects to certain things that were not in the physical notice itself, I don't think he objects, and he didn't object at the hearing, to the process, the way it was set up and structured and designed to get the best yield possible. I don't think any of us know why people didn't, you know, respond in greater quantities than they actually did, but, you know, 50,000 in most cases is not a terrible yield. It just so happens that this case involves a class size that is appreciably larger, and I think everybody was surprised at the result. What is the aggregate number of the putative class? I'm not sure, Your Honor. I know that people have bandied about 1.3 million. It's my belief that it's, you know, considerably in excess of that, but I don't at this moment have a recollection as to what the number is. Thank you. We'll hear from Mr. Frank. Thank you, Your Honor. And I certainly promised that if they had come to the district court with a settlement that paid the class under $3 million, all the attorneys got $14 million, we would be here today also. So the PSYCRAE did not create. I will tell you on the attorney's fee point, I mean, in one sense, it's kind of tough to object to $0.37 on the dollar when you do the Lodestar crosscheck. You're usually talking about a number that's, you know, a multiple of the amount that goes to or that the counsel expended within the firm. Here it's not a multiple. It's 37%. Well, Your Honor, as sentence indicated, the crosscheck is not to create a floor. It's a ceiling to cap what it would otherwise be a gigantic percentage of recovery. A ceiling, I mean, not necessarily. I don't remember that. And I remember also an opinion that came out. Are you talking about the ascendant that I was on the panel or the ascendant that Judge Grant was on the panel? You don't remember. I apologize that my memory isn't that good. You could have something more than 100% in a particular case. That's correct. And so this case is, you know, in terms of the percentage, it's, I mean, the blink response is this is easily affirmable. I'm not saying affirmed, but affirmable, because it's so much less than what you typically see. Well, if that's the case, then you're abandoning the percentage recovery method because. No, I mean, what you're saying is you need to subtract the PSI PRE amount from, in other words, you've got to take that out of the equation. And in this case, let's say the number is 4 million. Probably you've got, you know, 20-some million that you might want to take out and say that it's X percent of whatever it is that goes to the class, and X percent of 4 million is, you know, the number will go up in terms of percentage, but that's what I thought you were saying. That is certainly what we're saying, that there needs to be a correspondence, and we're just asking for what. You cite a lot of cases about the percentage of the fund and that we should look to the percentage of the recovery, but you don't cite any cases for the proposition that PSI PRE is to be removed from the recovery. Well, we're not saying remove it from the recovery. We're saying count it at a discount, like Judge Rosenthal did in Heartland, like you did in Lenardo, which wasn't a PSI PRE, but it was a similar circumstance. Right, but it was not a PSI PRE case. That was not a PSI PRE case. What you did there was you averaged the funds with the amount that the class actually recovered. What's the principle basis for a discount, and if so, what should be the discount? The principle for the discount is to incentivize class counsel to not be indifferent between the PSI PRE and their own clients, which is what effectively happened here. Now, how is that a reasonable inference, right? I mean, they negotiated a deal with a rational method of coming up with what they believed the size of the class would be and then what the yield would be based on those assumptions. Or are you saying that all of their assumptions were faulty, and because they were faulty, that's why they should be penalized? We know their assumptions were faulty. We see that there's less than $3 million in claims, and you can expect that when you force class members to fill out a four-page form that gives misleading instructions. And I ask you to read part two on page 276 of the appendix. You know, other records that show you purchased the baby product and when the purchase was made, there's no way you get a photograph from that. And they're going back and forth on whether a photograph does count, and if they're saying that a photograph doesn't count, then we have reversible error because the judge said the settlement was fair because the class members could retroactively submit a photograph. Let's say you go back. I'm sorry. Go ahead. Let's say you go back. You re-notice, and you get X percentage more claims, but it all adds up to another million dollars. Now, is it your point that at that point, the excess shouldn't go to Cypre? There should be a recalculation among those class members who've made claims? Or at that point, would you say, okay, we've had our piece. We think that it's worked, and if that amount is to go to Cypre, our only question is we want notice of who it is ahead of time. What I'm saying is that we want class counsel to be incentivized to argue for the cleanest, easiest notice and claims process possible. And when Cypre is counted dollar for dollar, the same as a dollar going to a class counsel's clients, class counsel has no incentive to say, okay, four-page claim form with confusing instructions. You have to answer my hypothetical question. But certainly on remand, if you give the instruction, class counsel's payment will be based on the percentage of the recovery with a discount for Cypre, I think we'll see class counsel suddenly arguing for simpler claim forms, more notice, because now they will be incentivized to make sure that the money is going to their clients rather than to their favorite charity. But ironically, if we reduce class counsel's award and we can't find any more class members, then the Cypre award goes up, right? I don't have a problem with that. Okay. So long as it's a 3.07 Cypre that meets the ALI standards. Now, the $35 million that was ultimately settled here, you don't have a problem with that, do you? We're not saying it should be $70 million or $350 million. We're not sitting here contesting how to value the underlying antitrust case. Okay. Thank you very much. Very quickly, you asked me where we raise the stuff in our briefing, pages 12 to 13 and 39 to 47 in our opening brief, and pages 19 to 24 in our reply brief. And if I can make just one other point, in this country, we send people to prison based on the testimony under oath of people who say that they were victims of crime. And to say that a statement under perjury in the course of filling out a four-page claim form is insufficient to make a $100 claim in a class action, I think that's very surprising. Thank you very much. Thank you, Your Honor. Thank you to all counsel for a well-presented argument.